# DOCKET NO: 10-1155

————————

IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

————————

# HENRY MCLAURIN and
# MILLIE MCLAURIN,

**Plaintiff-Appellants,**

v.

# VULCAN TREADED PRODUCTS, INC. and
# GRAND RAPIDS NUT & BOLT, INC.,

Defendant-Appellees.

————————

APPEAL FROM THE U.S. DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
5:08-CV-89-F

————————

# BRIEF OF PLAINTIFF-APPELLANTS

————————

Daniel F. Read
Attorney at Law
115 E. Main St.
Durham, North Carolina 27701
919-683-1900

CORPORATE DISCLOSURE STATEMENT                                    i

INDEX                                                            ii

TABLE OF CASES AND AUTHORITIES                                  iv

STATEMENT OF SUBJECT MATTER
 AND APPELLATE JURISDICTION                                      1

STATEMENT OF THE ISSUES                                          1

STATEMENT OF THE CASE                                            2

STATEMENT OF THE FACTS                                           3
        Plaintiffs                                               3
        Accident                                                 3
        Injury                                                   5
        Manufacture of the Drop Handle                           5
        The Original Defect Existed when the Rod was Manufactured    6
        The Combination of Bending and Galvanizing Caused Embrittlement  7
        A Bad Combination                                        8
        The Final Fracture was caused by the Initial Crack       8
        Cracking and Embrittlement are Industry Concerns         9
        There Was No Inspection of the Parts                    10
        The Contracts                                           11

JUDGE FOX'S DECISIONS                                           12

SUMMARY OF ARGUMENT                                             14

JUDGE FOX ABUSED HIS DISCRETION BY ALLOWING                    15
DEFENDANT VTP TO AMEND ITS COMPLAINT
        Standard of Review                                      15
        Argument                                                15

JUDGE FOX ERRED BY ALLOWING SUMMARY JUDGMENT                   16
AGAINST THE REMAINING DEFENDANTS.
        Standard of Review                                      16
        The *DeWitt* Case                                       17

There is Ample Evidence to Satisfy the Elements of a Product            18
Liability Claim

Judge Fox Erred in Disregarding Mr. Hong's Testimony and               20
Refusing to Consider Minimum Inspections

The Defendants were Indeed Negligent                                   21

Contributory Negligence                                               25

The Warranty Claims                                                   25

CONCLUSION                                                            29

CERTIFICATE OF COMPLIANCE                                             30

CERTIFICATE OF SERVICE                                                31

# TABLE OF CASES AND AUTHORITIES

**North Carolina Cases**

*Baker v. Dept. of Correction,* 85 N.C. App. 345, 346, 354 S.E.2d 733, 734    24
  (1987)

*Beckles-Palomares v. Logan,* ___ N.C. App. ___, ___ S.E.2d ___    24
  (COA09-567) (February 2, 2010)

*Corprew v. Chemical Corp.,* 271 N.C. 485, 157 S.E.2d 98 (1967)    22

*Cox v. Hozelock, Ltd.*, 105 N.C.App. 52, 411 S.E.2d 640, *disc. rev. denied*    28
  *and appeal dismissed*, 331 N.C. 116, 414 S.E.2d 752, *cert. denied*, 506
  U.S. 824 (1992)

*Dewitt v. Eveready Battery Co.*, 355 N.C. 672, 565 S.E.2d 140 (2002) 17

*Hairston v. Alexander Tank & Equip. Co.,* 310 N.C. 227, 233, 311 S.E.2d    19
  559, 565 (1984)

*Hensley v. Ray's Motor Co. of Forest City, Inc*., 158 N.C.App. 261, 265,    25
  580 S.E.2d 721, 724 (2003)

*HPS, Inc. v. All Wood Turning Corp.,* 21 N.C. App. 321, 324, 204 S.E.2d    26
  188, 189 (1974)

*Kessing v. National Mortgage Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823,    17
  830 (1971)

*McWilliams v. Parham*, 273 N.C. 592, 160 S.E.2d 692 (1968)    23

*Morrison v. Sears, Roebuck & Co.,* 319 N.C. 298, 303, 354 S.E.2d 495,    18
  498 (1987)

*Nicholson,* 124 N.C. App. 59, 68-9, 476 S.E.2d 672, 678 (1996)    18

*Nicholson v. American Safety Utility Corp.*,  346 N.C. 767, 488 S.E.2d    18
  240 (1997)

**Other State Cases**

*Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960)    17

*J.O. Hooker & Sons, Inc. V. Roberts Cabinet Co., Inc.,* 683 So.2d 396    27
  (Miss. 1996)

## Federal Cases

*Bonebrake v. Cox,* 499 F.2d 951 (8th Cir.1974)                                          26

*Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986)                                        16

*Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001)                        17

*Medigen of Ky., Inc. v. PSC of W.Va.*, 985 F.2d 164 (4th Cir. 1993)                   15

*Nance v. Gulf Oil Corp.*, 817 F.2d 1176, 1179-80 (5th Cir.1987)                         15

*National Bank v. Pearson,* 863 F.2d 322, 327 (4th Cir.1988)                             15

*Republic Steel Corp. v. Pennsylvania Engineering Corp.*, 785 F.2d 174                   27
  (7th Cir. 1986)

*Vitex Mfg Corp., Ltd v. Caribtex Corp*, 377 F.2d 795 (3d. Cir. 1967)                    28

*Wallace v. DTG Operations, Inc.,* 442 F.3d 1112 (8th Cir. 2006)                       16

## North Carolina Statutes

N.C. Gen. Stat. § 25-2-102 (2001)                                                        26

N.C. Gen. Stat. §99B                                                                     18

*N.C.P.J.I.* §102.19                                                                     19

## Federal Statutes

28 U.S.C. §1291                                                                          1

28 U.S.C. §1331                                                                          1

## CORPORATE DISCLOSURE STATEMENT

Now comes Daniel F. Read, Attorney at Law, North Carolina State Bar No. 11172, 115 E. Main St., Durham, North Carolina 27701 and states that he is the attorney for Plaintiffs Henry D. McLaurin and Millie McLaurin, Plaintiff-Appellants, and that Plaintiffs are natural persons and that neither they nor attorney Read are agents of, subsidiaries of, or instrumentalities of any corporate person, and that this matter and this appeal are being prosecuted solely with regard to and to enforce the private claims for damage of Plaintiffs Henry D. McLaurin and Millie McLaurin, both natural persons. Daniel F. Read, Attorney at Law is a sole proprietor of a one-attorney law firm in Durham, North Carolina and has no affiliation with any corporation that may have an interest in the subject matter of this case.

This the _12_ day of _April_, 2010.

_____
Daniel F. Read
Attorney at Law
State Bar No. 11172
115 E. Main St.
Durham, North Carolina 27701
919-683-1900
Email: readlaw@aol.com

1

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This court has subject matter jurisdiction under 28 U.S.C. §1331, federal question jurisdiction. The case was initially filed in the Superior Court of Sampson County, North Carolina. Because all Defendants are out-of-state corporations it was then removed to the United States District Court for the Eastern District of North Carolina. No challenge was made to the District Court's jurisdiction by the court and the case was not dismissed or remanded for lack of jurisdiction. Appeal is of right from the final decisions of the district court, 28 U.S.C. §1291, granting the Defendants' motions for summary judgment as to all claims.

The order allowing summary judgment was entered January 8, 2010. Notice of appeal was filed with the Court on February 3, 2010.

The appeal is from summary judgment denying and dismissing all of Plaintiffs' claims and is from a final decision. There are no other issues pending before the District Court.

## STATEMENT OF THE ISSUES

The issue on appeal is whether the District Court erred as a matter of law in granting the motions for summary judgment as to all claims.

-1-

## STATEMENT OF THE CASE

The case was initially filed in 2008 in the Superior Court of Sampson County, North Carolina. Because all Defendants are out-of-state corporations it was then removed at their request to the United States District Court for the Eastern District of North Carolina. Plaintiffs later took a partial dismissal as to one of the Defendants, East Jordan Iron Works, Inc., which is no longer in the case. The remaining Defendants moved for summary judgment, Plaintiff responded and Defendants filed replies. In one they argued that the UCC implied warranty of merchantability did not apply since the underlying contract was not for the sale of goods. Partial summary judgment was entered on the negligence claims and dismissing Grand Rapids from the case on October 27, 2009. The Court then on November 16, 2009 ordered that Vulcan make a motion to file an amended complaint. They did so and the court on November 23, 2009 ordered additional evidence be submitted regarding the nature of the contract. That was submitted on December 21, 2009 and on January 8, 2010 the order allowing summary judgment was entered. Notice of appeal was timely filed with the Court on February 3, 2010. The matter is now before the United States Court of Appeals for the Fourth Circuit for review.

## STATEMENT OF THE FACTS

**Plaintiffs**

Henry McLaurin was born in 1949. He began working for the federal government after a career in construction trades. At the time of this incident he was in good health for a man of his age. He had had hernia and esophageal surgery but was fully recovered from those. He had missed a lot of time in 2003 due to heart problems but as of December 2005 he had recovered and was working full time and was able to make significant overtime (JA-257). He has been married 5 years to his present wife, Millie; his first wife died of cancer.

**Accident**

The accident occurred on December 22, 2005 at the intersection of Gruber Road and the All-American Expressway at Fort Bragg, where the Army had just installed a new main security gate for traffic entering the fort off the expressway. Mr. McLaurin was detailed to inspect telecommunications equipment and signal equipment and splice fiber optic cable, inside a new manhole just off the side of the exit (JA-257).

Entrance to the manholes was gained by pulling the lid aside with a bar. Standard operating procedure called for a technician such as Mr. McLaurin to slide

a manhole lifting bar (approximately 3 feet long) under a steel drop handle or U-bolt (the part at issue in this case) that was set into the cover. The handles drop down through two holes in the cover and are held in place with nuts on the underside; they lie flush with the top of the cover when not in use.  After lifting the handle and inserting the bar under it, the technician would then pull on the bar, lifting the cover enough to raise it over the surrounding ring, and pull on it to slide it out of the way to gain access to the hole. Moving manhole covers with the bar in this manner was a task Mr. McLaurin had done many times before, and while the cover was very heavy (it weighed about 290 pounds) he had done this sort of thing by himself safely for many years (JA-257).

Mr. McLaurin inserted his bar under the handle and then bent forward and pulled up and back on the bar to move  the cover. As he did so the bolt broke at both bends, shearing the top horizontal piece off and suddenly separating the lifting bar from the cover. Mr. McLaurin, who had been pulling up and back with full force, was totally surprised. He lost his balance and fell backward hard. The manhole was located at the top of a slight bank and he fell over backward and down the bank and into a guardrail (JA-258).

**Injury**

The accident was promptly reported to the U.S. Department of Labor's Office of Workers Compensation Programs in Jacksonville, Florida, which handles claims for federal employees in North Carolina (CA-1, JA-192). So far Mr. McLaurin has had three surgeries, two on his knee and one on his shoulder. Because of the surgeries he developed a blood clot (thrombosis) in his leg, which has required him in turn to take blood thinners (JA-258-9). The lien of the United States to date for the workers compensation claim is at least $150,132.68 (Letter from DOL, JA-195).

**Manufacture of the Drop Handle**

Vulcan Threaded Products (hereafter referred to simply as "VTP") initially denied that it manufactured the drop handle in question (VTP Answer, ¶ 4, JA-19-20). Purchase orders and other discovery documents from the other Defendants indicate that they did indeed manufacture it. In his affidavit Mr. Buckner, VTP's witness,  does not deny that VTP manufactured the bolt (JA-45-6). In its discovery answers Grand Rapids (hereafter referred to simply as "GRNB") wherein they state that the only place they purchased the drop handles was from VTP (JA-228).

**The Original Defect Existed when the Rod was Manufactured**

Regardless of whether someone else may have cracked the drop handle before Mr. McLaurin tried to use it to move the manhole cover, expert Wei Hong, known in the American business world as Bill Hong, was clear that the handle was cracked during the manufacturing process  (Hong depo (hereafter referred to simply as "HD") at 30-1, JA-122-3; Affidavit of Wei Hong, Exhibit 1 (hereafter referred to simply as "HA"), ¶ ¶ 12, 15, JA-58-9). He could tell this by observing that galvanizing material had flowed into the crack:

> This is the galvanized material.  It's like zinc.  This is base metal. See the bright line there go all the way through?  That's an indication of preexisting crack.  After, you know, the bending operations, crack is already there. The subsequent galvanized process made the galvanized material diffuse into this gap.... You see that that's the crack surface; right?  See, that's the galvanized zinc.  See the deposit on the -- along the crack?  There's galvanized material present in the crack.  That means -- just  indicate it is a preexisting crack.

(HD at 31, JA-123) (similar at HD at 49, 60, JA-141, -162).

> Q:    Do you know how that crack occurred?
>
> A:    Most likely during the bending process.
>
> Q:    All right.
>
> A:    But certainly it is before the galvanized process.

(HD at 31, JA-123). The way to address cracking and stress caused by cold

bending is to heat it after it is bent: "usually the bending process was followed by a

stress-relief heat treatment." (HD at 33, JA-125, HA ¶ 19, JA-59-60). This is a

common process (HD at 50, JA-69).

**The Combination of Bending and Galvanizing Caused Embrittlement**

Additional lab evidence showed the rod was defective:

> [I] haven't finished yet on the lab evidence that prove it is
> defective.  You know, the preexisting crack is only one --
> one aspect. The other aspect is the fracture behavior,
> which I did a lot of SEM scanning, electron microscope
> examination....  the common practice for any failure,
> before we do anything, we exam the fracture surface. In
> this case, for this kind of materials, ideally you -- it's not
> defective, it should show either ...cleavage or dimple
> rupture features.  That's for  nondefective material.  But
> in this case, near the crack origin, you see -- we saw
> typical  intergranular fracture features.

(HD at 34-5, JA-126-7).

Because of these intergranular features, Hong could tell the rod was

embrittled:

> [N]ear the fracture origins, there's intergranular features
> that will indicate somehow the material was embrittled,
> because I -- I was not aware of the actual coating
> process....this part is plated, and then you have
> intergranular fracture features that will indicate it's

-7-

> hydrogen embrittlement. ...But in any case, you know,
> the material was embrittled. That's was evidenced by the
> intergranular features.

(HD at 36-7, JA-128-9). Plating or hot dipping the metal can cause embrittlement

and the standard practice to reduce embrittlement is baking the part (HD at 63, JA-

155).

## A Bad Combination

Hong was of the opinion that the two problems combined to cause the

fracture:

> [T]here are two issues here: One is a preexisting crack,
> that serve as a stress riser. When you stress the part, a
> crack will start from there. And then the intergranular
> features, that's indication of a material embrittlement.
> This -- there could be no preexisting crack, but material
> still embrittled. That's separate issue here. But in this
> case, it just a bad combination.

(HD at 50, JA-142). "Whenever in the part there's a crack, preexisting crack there,

that make the part more susceptible to any overloading conditions" (HD at 38, JA-

140).

## The Final Fracture was caused by the Initial Crack

Hong was further of the opinion that the crack that was put there in the

-8-

manufacturing process was a key factor in the final break of the handle:

> If there are any preexisting crack, that would be different story. The preexisting crack surface notch -- if anything have a notch in there, it would be -- it will require much less load to break it....the microcrack serve as a notch; right? I can show you just visually...If you break here (indicating), it take significant effort to break it. But here, (indicating). See, that's why the preexisting crack is critical, because you need much, much less load to break it than you break it without the crack here. You just can't break it. That's a simple analogy. That's true in engineering, you know, that any notch, any preexisting crack, that's critical to loading conditions.

(HD at 76-7, JA-159-60). In his affidavit Hong makes this very clear,

> However it was handled, it is probable that the crack in the bolt was a significant contributing factor in the final fracture and that the bolt probably would not have fractured without the cracks that were in it when it was manufactured. The stress riser (the pre-existing cracks) probably made whatever other handling that occurred more destructive.

(HA ¶ 15, JA-58-9). This was not a freak accident (HA ¶ 20, JA-60).

**Cracking and Embrittlement are Industry Concerns**

Hong suggested that the bolts could be easily inspected for cracks.

> ...for critical applications, they will do nondestructive testing, such as ultrasonic, liquid penetrant or mag particle, but that's for, you know, very critical applications like aerospace. There are no microcrack

-9-

allowed.

Q.  You would agree with me U-bolts for manhole covers are not critical like aerospace and sending a shuttle into space?

A.  I don't know.  But obviously the aerospace component have much, much more stringent requirement...For any fasteners, that hydrogen embrittlement, that's a major concern.  And the stress corrosion cracking and liquid metal embrittled, that's a major concern for this industry.

(HD at 85-6, JA-177-8).

These methods are cheap and efficient and should have been used in this case (HA ¶ 18, JA-59); at a minimum the rod should have been inspected for cracks after bending (HA ¶ 19, JA-59). Even if the industry standard is to bend steel rod cold without heating it, all the expert evidence is that this causes stress on the metal and that heating the metal and baking it after hot dipping relieve stress from the metal and reduce embrittlement (HD at 33, 63, JA-125, -155).

**There Was No Inspection of the Parts**

In discovery VTP was asked whether they were the manufacturer of the product and to describe their manufacturing process (JA-200). They responded that every tenth drop handle is visually inspected to check threading, peak and various

-10-

lengths (JA-200). No inspection is done for cracks. The bending and dipping

process is described without any mention of any inspection of the handles for

cracks  (JA-201). Only after this accident did VTP receive a request from GRNB

that they heat the handles during manufacturing and inspect the drop handles for

cracks (JA-209). In his affidavit Mr. Buckner states that VTP does not have the

ability to heat the steel during the bending process but he says nothing about at

least being able to inspect it for cracks (JA-45-6). GRNB was asked in discovery if

they did any tests on the parts and denied doing any tests at all (JA-221-2). They

passed a specification on to VTP, got the parts, and passed them on to EJIW,

heedless of their quality.

Ironically, in proceedings initiated by VTP to limit imports of Chinese steel,

VTP CEO Upton decried a purported 60% failure rate in samples of Chinese

threaded rods, and stated "...in normal applications for this product, only a zero

percent rate is acceptable" (JA-214). How a zero percent failure rate can be

achieved with absolutely no inspection for stress cracks, after two processes which

can cause or aggravate fracture potential, was left unexplained.

**The Contracts**

The chain of contracts that brought the drop handle to Fort Bragg began with

the Department of Defense (hereafter referred to simply as "USDOD") contracting with ECI, Inc. to build the Gruber Road security control point and a separate truck plaza (JA-300, 314 ). ECI contracted with Starr Electric to deliver and install the electric support system including the manholes; Starr did not contract directly with USDOD (JA-328). Starr purchased the manholes in sections from Stay Right, another supplier (JA-329), and assemble them at the job site, which included fixing the manhole ring to the top of the manhole. The actual metal manhole ring and cover was produced by EJIW, which bought the drop handles from GRNB which in turn bought them from VTP. EJIW witness Schweitz was able to immediately recognize the manhole at which Mr. McLaurin was injured as one of the lot his company sold to Stay Right and for which the handles had been purchased from GRNB and made by VTP (JA-285). There was no evidence of any contract between VTP or GRNB and USDOD.

## JUDGE FOX'S DECISIONS

In his order of October 27, 2009, Judge Fox ruled that because Plaintiffs' expert Hong could not demonstrate that VTP should have, in the exercise of reasonable care, performed stress relief heating of the steel after bending it, and therefore granted summary judgment on the negligence claim against VTP (Order

at p. 14, JA-275). He then ruled that GRNB was a "mere conduit" and had no duty to inspect the handles and no reasonable opportunity to inspect the defect which admittedly was unlikely to be invisible to the naked eye after the handle was galvanized  (Order at pp. 15-7, JA-276-8).

Citing Hong's statement that critical applications could be tested with cheap means and that he did not know what inspections should be performed (HD at 85, JA-177), Judge Fox ruled that his affidavit contradicted his deposition and disregarded his affidavit testimony about how minimum inspections could be performed (Order at pp. 12, JA-273). He did not address the contention that no inspections had been performed at all.

With respect to the implied warranty claims, he noted that VTP argued for the first time in its reply to Plaintiffs' response to the motion for summary judgment that the claim must fail because Mr. Mclaurin was not in privity with the manufacturer either by contact or through the statutory exception under N.C. Gen. Stat. §99B-2 (Order at p. 8, JA- ). He directed Plaintiffs to produce evidence that his employer had purchased the manhole cover and handle (Order at p. 9, JA- ). Defendants did not argue, and the Court did not rule in its October 27 order, that the claim must fail in any event because the underlying contract was for service as opposed to goods.

-13-

In his November 13, 2009 order Judge Fox, responding to argument from VTP noted that the contract between USDOD and ECI may be a service contact as opposed to a sale of goods and directed production of further evidence on this point (Order at p. 3, JA- ). He noted but overruled Plaintiffs argument that VTP had failed to raise this issue in its answer or original motion for summary judgment, *Id.* and directed VTP to move to amend its answer and ordered the production of further evidence as to this issue.

Following production of contract between USDOD and ECI and the affidavit of Don Harrison for Starr Electric, the motion for summary judgment was granted on January 8, 2010. Judge Fox examined the nature of the contract between USDOD and ECI, determine it was predominantly a contract for services as opposed to the sale of good, and therefore USDOD was not a "buyer" under the UCC. Since it was not a buyer the warranties imposed by the UCC did not apply and summary judgment as to the warranty claims was allowed (Order at p. 6-7, JA-340-1).

## SUMMARY OF ARGUMENT

As set forth below, Plaintiffs contend that Judge Fox erred by allowing

-14-

Defendants to amend their complaint and then by granting summary judgment, where the evidence was uncontradicted that the suspect part was never inspected and where the UCC warranty should have applied.

## JUDGE FOX ABUSED HIS DISCRETION BY ALLOWING DEFENDANT VTP TO AMEND ITS COMPLAINT

### Standard of Review

Review of decisions regarding amending pleadings is for abuse of discretion. *National Bank v. Pearson,* 863 F.2d 322, 327 (4th Cir.1988). Factors to be considered are whether the amendment would require additional discovery and whether the opposing party would be prejudiced. *See Nance v. Gulf Oil Corp.*, 817 F.2d 1176, 1179-80 (5th Cir.1987), *cited with approval Medigen of Ky., Inc. v. PSC of W.Va.*, 985 F.2d 164 (4th Cir. 1993).

### Argument

Here the case had been filed for over a year, discovery had been completed, and the case was scheduled for trial in December 2009 (JA-41). Defendants had had ample opportunity to discover the nature of the contracts with USDOD and in fact the trial was continued to allow production of the contracts. The mediated

-15-

settlement had already taken place and failed to reach a resolution. Under the circumstances, Plaintiffs had to track down the contract and provide additional evidence, and clearly suffered prejudice by having to produce the information as that ultimately was the point on which their claim was dismissed.

Under the circumstances, it was error and abuse of discretion for Judge Fox to invite Defendant VTP to file a motion to amend and then allow it.

## JUDGE FOX ERRED BY ALLOWING SUMMARY JUDGMENT AGAINST THE REMAINING DEFENDANTS.

### Standard of Review

To defeat summary judgment Plaintiffs must demonstrate that there is evidence in the record before the court from which a reasonable fact finder could find in their favor.  Plaintiffs must demonstrate that there are genuine issues of material fact. A fact is "material" if it has the potential to affect the outcome of the case. If a case can only be resolved by weighing conflicting evidence, summary judgment is not appropriate. *See for example Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences are to be drawn in favor of the non-moving party; where a reasonable fact finder could draw an inference in favor of the non-moving party without resorting to speculation, summary judgment is not appropriate even if the

-16-

court might draw a different inference. *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112 (8th Cir. 2006). In North Carolina law, summary judgment is considered a drastic remedy to be used with caution. *Kessing v. National Mortgage Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971). On review on appeal the question is one of law for the reviewing court. *See for example Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).

### The *DeWitt* Case

The leading North Carolina products liability case is *Dewitt v. Eveready Battery Co.*, 355 N.C. 672, 565 S.E.2d 140 (2002), which involved personal injury from leakage from batteries, which were designed to vent fluid if pressure got too great. The Supreme Court of North Carolina, following *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960) (evidence that after ten days of error free operation the steering wheel on a car suddenly started to wobble bizarrely was sufficient to establish circumstantially that the product was defective at sale), held that a plaintiff could proceed with only circumstantial evidence of a defect.

North Carolina recognizes that a claimant need not necessarily be the actual purchaser of the allegedly warranted goods as long as they are a foreseeable user. *See* N.C. Gen. Stat. §99B-5. Thus in *Nicholson v. American Safety Utility Corp.*,

346 N.C. 767, 488 S.E.2d 240 (1997), an employee was supplied with gloves by the employer and was allowed to maintain an action against the manufacturer of the gloves on the grounds that they were defective and thus failed to insulate him against electric shock.  Summary judgment had been granted in the trial court on all grounds including implied warranty, but the Court of Appeals reversed on that issue. *Nicholson,* 124 N.C. App. 59, 68-9, 476 S.E.2d 672, 678 (1996),  *citing Morrison v. Sears, Roebuck & Co.,* 319 N.C. 298, 303, 354 S.E.2d 495, 498 (1987). The Supreme Court did not disturb this holding.


**There is Ample Evidence to Satisfy the Elements of a Product Liability Claim**

There is ample evidence as set forth above to satisfy these elements. Defendants do not dispute or argue in the memoranda that the drop handle was not a product subject to an implied warranty of merchantability as indeed it was.

VTP may argue that there is no proof that the handle was not defective at the time of sale but the evidence was clear from Hong's materials that the initial crack and embrittlement occurred during the manufacturing process. Indeed, with the galvanizing material flowing into the crack it could not have occurred at any other time.

Hong was asked whether other people may have cracked the bolt between

-18-

the time it left VTP and the time Mr. McLaurin encountered it, and he candidly admitted that the different amounts of corrosion suggest that someone else may have cracked it more. But as he demonstrated in his deposition and he made clear in his affidavit, the initial crack served as a "stress riser" which probably made subsequent insults to the handle more destructive. Hong is of the opinion that the bolt probably would not have fractured without the original crack(s). Counsel may suggest other possible causes, but at a minimum there is enough for a jury to decide if the crack caused the fracture. In this regard, the sixth *DeWitt* factor is crucial, as it is Hong's opinion that the final fracture would not have occurred but for the original manufacturing defect. Of interest in this respect is the fact that in *DeWitt* plaintiff's own testimony suggested that he may have handled the subject batteries improperly and made assumptions about how he used them. Nevertheless his case was allowed to go the jury. This one should as well.

This is consistent with North Carolina's law of proximate cause, under which it is clear that there may be more than one proximate cause of an injury. *N.C.P.J.I.* §102.19. If two or more causes combine to cause an injury, that does not relieve either actor unless the other's liability supercedes or makes moot the liability of the first. *See for example Hairston v. Alexander Tank & Equip. Co.,* 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984).

-19-

Here Henry McLaurin followed a standard procedure he had used for decades. There is no evidence that he did anything other than follow that procedure, there is expert evidence that without the defect in the handle the fracture would not have occurred, and the main evidence relied upon to negate this is the suggestion that someone else may have extended the crack after sale. This evidence is therefore clear on liability, certainly at this stage of the proceedings, and Plaintiffs have presented a circumstantial case at least as good as that in *DeWitt* and should be allowed to proceed with this case to a jury trial.

## Judge Fox Erred in Disregarding Mr. Hong's Testimony and Refusing to Consider Minimum Inspections

The question Mr. Hong was asked that Judge Fox relied upon to establish a contradiction referred to the inspection duties of distributors. And he went on to say that "stress corrosion cracking and liquid metal embrittled, that's a major concern for this industry" (JA-178), echoing the statements of VTP's own CEO. In his affidavit Hong later suggested possible cheap tests that could be performed, in response to what he had already identified as a "major concern." This was not a contradiction, given the context of the question that was asked, Mr. Hong's obvious less than perfect command of English, and the fact that he immediately

and readily identified in further response the problems that caused the handle to break.

Moreover, it is clear from the record that this is not a question of inadequate inspection but of no inspection at all. Hong identified cracking as a concern and suggested possible tests in his deposition and amplified on that in his affidavit. GRNB's subsequent request suggests other possible tests. No tests were performed.

Judge Fox was charged with construing the evidence in favor of the non-moving party and giving them the benefit of every favorable inference. It was error to construe this evidence strictly against Plaintiffs.


**The Defendants were Indeed Negligent**

Judge Fox grounded his ruling in favor if Defendants on the issue of negligence on the fact that the industry standard with respect to bending the steel appears to be to bend it cold and that heat treating it afterwards to relieve stress is not a standard practice. He said nothing about the admitted and absolute failure of VTP to inspect the steel for cracks after it was bent. By their own admission Defendants did nothing to inspect for stress cracks, after two processes which can cause or aggravate fracture potential. And GRNB had notice by simple observation of the press marks on the handles that they had been cold bent and only after this

accident did they even request that VTP inspect them for cracks, much less inspect them themselves. Hong is clear that a very minium the rod should have been checked for cracks after bending, and that there were cheap and simple tests available which could have been used. It was not inspected. This was negligence.

As the Supreme Court of North Carolina stated in *Corprew v. Chemical Corp.,* 271 N.C. 485, 157 S.E.2d 98 (1967), a manufacturer must exercise the reasonable care. "His negligence may be found over an area quite as broad as his whole activity in preparing and selling the product. He may be negligent first of all in designing it, so that it becomes unsafe for the intended use. He may be negligent in *failing to inspect or test his materials*, or the work itself, to discover possible defects, or dangerous propensities." *Id.* at 491, 157 S.E.2d at 102-3 (emphasis added).

If the industry standard is to bend rod cold and send it out without any inspection other than to make sure the size and threading meets specifications, that is a recipe for inevitable accidents and injuries such as happened to Henry McLaurin. In negligence cases, ordinary custom may be evidence of the standard of care and hence of negligence, but if the ordinary custom is dangerous and careless then it is certainly not conclusive as a matter of law. *See for example McWilliams v. Parham*, 273 N.C. 592, 160 S.E.2d 692 (1968).

If, as Mr. Upton contends, the industry standard for normal applications is a zero failure rate, then to pass drop handles into the market without any inspection for their safety and suitability is aggravated negligence and certainly cannot entitle VTP to summary judgment.

North Carolina law imposes a duty on manufacturers to perform some quality assurance for safety of their product, not merely to see if they are cut the right length and threaded correctly. This should be especially true in a case such as this where the manufacturing process by its very nature conceals the safety hazard. And it should be especially true when the part in question is one that will be a main contact point for humans exerting considerable force to move heavy objects.

At least in *Nicholson* the manufacturer and intervening handlers of the merchandise conducted some tests to see if the gloves met their specifications. The Supreme Court held that the issue of negligence as to inspection was properly submitted and reversed the court below which had found that the plaintiff was contributorily negligent as a matter of law. Where no safety inspections are undertaken at all, and where the metallurgy expert says at a minium the rods should be inspected for cracks, Plaintiff has made out at least a jury case of negligence.

GRNB argued successfully that it is a "mere conduit," effectively shielding

-23-

it from any claim by Plaintiffs that they were damaged by its negligence.

In *Baker v. Dept. of Correction,* 85 N.C. App. 345, 346, 354 S.E.2d 733, 734 (1987), the Court held that the law imposes upon every one who "enters upon an active course of conduct a positive duty to exercise ordinary care to protect others from harm and a violation of such duty constitutes negligence." There a DOC officer closed a window which swung closed toward the outer wall from inside the room without first looking outside to see if the window washer had his hand on it. By embarking on the course of closing the window knowing there were window washers outside, the Court held, the officer had a duty to exercise ordinary care and look. In *Beckles-Palomares v. Logan*, ___ N.C. App. ___, ___ S.E.2d ___ (COA09-567) (February 2, 2010), the Court held again that the defendant municipality, by undertaking to establish standards for traffic safety and then to inspect the streets for violations, could be sued where they failed to do any inspections.

Similarly here, as a procurer of handles for EJIW, GRNB had at a minimum a duty to ensure that the handles they purchased were manufactured according to reputable methods and were inspected for safety. To rule otherwise, that they have *absolutely* no duty to even ask about suitability inspections (and they would have discovered there were none) and can simply purchase and pass on whatever parts are cheapest or most readily available, would encourage unsafe and dangerous

-24-

practices in the industry and encourage manufacturers to use third party mediaries to screen their shoddy practices. GRNB embarked on a course of conduct to procure and distribute bolts, and reasonable care should include that they at least make some effort to see if the bolts are inspected. They did not. They did finally ask VTP to do so, but only after this accident. This Court should not permit them to escape liability for their wilful blindness.

**Contributory Negligence**

All the evidence is that Henry McLaurin tried to move the cover using standard operating procedure. Defendants presented no evidence that Mr. McLaurin's method of trying to open the manhole was unsafe in itself. Moreover the cracks in the handle were not visible. Contributory negligence is not an issue.

**The Warranty Claims**

In deciding that the contract was a mixed contract and that therefore the UCC implied warranties did not apply, Judge Fox relied primarily upon *Hensley v. Ray's Motor Co. of Forest City, Inc*., 158 N.C.App. 261, 265, 580 S.E.2d 721, 724 (2003). There the dispute arose out of the sale and delivery of a mobile home. The plaintiff complained about defects in the home but did not file suit until more

than three years after delivery and long after the breach became apparent. He

attempted to argue that notwithstanding that the mobile home was not realty that

the contract was for service.

The Court of Appeals held that the scope of the UCC is limited to

"transactions in goods" and does not apply to contracts for the provision of

services. N.C. Gen. Stat. § 25-2-102 (2001). It followed the leading case of

*Bonebrake v. Cox,* 499 F.2d 951 (8th Cir.1974), which established a "predominant

factor" test for whether the UCC applies to a contract. Factors to be considered are

(1) the language of the contract, (2) the nature of the business of the supplier, and

(3) the intrinsic worth of the materials. *Id.* at 265. The court noted that previous

North Carolina decisions had applied a similar rule, *see HPS, Inc. v. All Wood*

*Turning Corp.,* 21 N.C. App. 321, 324, 204 S.E.2d 188, 189 (1974) (treating a

contract to furnish and install a boiler conversion system as a sale of goods) and

"expressly" adopted *Bonebrake.* Since the mobile home transaction was

predominantly a sale of personal property the UCC did apply and the claim was

time-barred.

*Hensley* and the cases cited involved remedies for defects in goods and

statutes of limitation periods.  Counsel has not found North Carolina authority

excusing a supplier of goods from responsibility for causing personal injury

-26-

because the predominant factor in the contract they were suppled under was a service contract. In that respect this appears to be a case of first impression.

One federal Circuit has suggested, even in applying *Bonebrake*, that it might reach a different result if personal injury were involved. *See for example Republic Steel Corp. v. Pennsylvania Engineering Corp.*, 785 F.2d 174 (7th Cir. 1986).

In other jurisdictions courts have taken a less mechanical approach and considered the nature of the underlying dispute in determining whether the UCC applies. Thus in *J.O. Hooker & Sons, Inc. V. Roberts Cabinet Co., Inc.,* 683 So.2d 396 (Miss. 1996), the Court held:

> It is very often the case that a construction contract will involve the furnishing of goods by a subcontractor, and this Court holds that, in such a mixed transaction, whether or not the contract should be interpreted under the UCC or our general contract law should depend upon the nature of the contract and also upon whether the *dispute* in question primarily concerns the goods furnished or the services rendered under the contract. The present case clearly does not concern the cabinets manufactured, but rather the refusal of Roberts to assume duties which Hooker contractually obligated itself to perform.  This Court would not hesitate to apply Article 2 if the present case involved, for example, a dispute over the quality of the cabinets, but the present case is in actuality a fairly standard contract dispute involving delegation of duties under a contract and the right to unilaterally rescind said contract.  The fact that goods were furnished in the present contract has no bearing on the legal analysis involved, given that the dispute in this

-27-

case clearly concerns the service aspect of this mixed transaction.

*Id.* at 400.

Similarly, in *Vitex Mfg Corp., Ltd v. Caribtex Corp*, 377 F.2d 795 (3d. Cir. 1967) the Court held that the UCC applied by analogy to what was essentially a service contract, where the defendant merely treated the cloth the plaintiff supplied and then returned it to the plaintiff. The Court held that the Code embodied the foremost legal thinking of the day as to what law should apply to commercial transactions. *Id.* at 798.

This was undeniably a commercial transaction and VTP and GRNB supplied a product which they knew could crack and which they made no effort to check to see if was dangerous. This Court should not allow them to argue that a foreseeable end user such as Mr. McLaurin has no remedy. It should apply the UCC by analogy and find that the warranty extended to Mr. McLaurin. North Carolina policy supports enforcing liability in its courts on those who ship dangerous products into the state. *See for example Cox v. Hozelock, Ltd.*, 105 N.C.App. 52, 411 S.E.2d 640, *disc. rev. denied and appeal dismissed*, 331 N.C. 116, 414 S.E.2d 752, *cert. denied*, 506 U.S. 824 (1992) (assertion of personal jurisdiction).

Otherwise a gross violation of public policy and safety will occur, and costs

116, 414 S.E.2d 752, *cert. denied*, 506 U.S. 824 (1992) (assertion of personal jurisdiction).

Otherwise a gross violation of public policy and safety will occur, and costs be pushed off on the United States which these defendants had good reason to know they could and should have avoided.

If Judge Fox's decision is allowed to stand this Court will sanction careless manufacturing and ironically invite Mr. Upton and his colleagues to abandon their claim of zero tolerance and sink to the level of their Chinese competitors. The American public deserves better.

## CONCLUSION

For the foregoing reasons Plaintiffs contend the decisions of Judge Fox should be reversed and the case remanded for trial on the merits.

This day is ___April 12, 2010.___

Daniel F. Read
Attorney at Law
State Bar No. 11172
115 E. Main St.
Durham, North Carolina 27701-3601
919-683-1900 (FAX 919-682-4955)
Email: readlaw@aol.com

-29-

## CERTIFICATE OF COMPLIANCE

This brief has been prepared using Times New Roman 14 point, proportionally spaced serif typeface.

Exclusive of the corporate disclosure statement, tables, and other administrative pages, this Brief of Plaintiff-Appellant contains less than 14,000 words. Total number of words counted by WordPerfect is 6,728.

I understand that a material misrepresentation can result in the Court's striking of this brief and appropriate sanctions. If the Court so directs, I will provide an electronic version of this brief and/or a copy of the word or line printout.

This the __12__ day of __April__ 2010.

_____
Daniel F. Read
Attorney at Law
State Bar No. 11172
115 E. Main St.
Durham, North Carolina 27701
919-683-1900
Email: readlaw@aol.com

-30-

## CERTIFICATE OF SERVICE

I, Daniel F. Read, hereby certify that I have this day served on the other parties to this action a copy of the foregoing document, namely Brief, by placing a copy in a stamped envelope, first class postage prepaid, addressed to them as shown below, and by placing said envelope in the custody of the United States Postal Service for delivery to them.

William Pollock, Esq.
Andrew D. Hathaway, Esq.
Attorneys at Law
CRANFILL, SUMNER & HARTZOG, LLP
P.O. Box 27808
Raleigh, NC 27611-7808

Jeffrey H. Blackwell, Esq.
Erin Collins, Esq.
Attorney at Law
HEDRICK GARDNER KINCHELOE & GAROFALO, L.L.P.
1838 Sir Tyler Dr., Suite 200
Wilmington, NC 28405

This day being _____April 12_____, 2010

Daniel F. Read

-31-